# CHARLESTON.

STATE v. ELLEN WORKMAN.

Submitted February 29, 1916.   Decided March 14, 1916.

TAXATION—*Forfeited Lands—Suit by State—Burden of Proof.*
   In a suit by the State to sell forfeited lands for the benefit of the school fund, the State must show that the land has been forfeited, and identify and locate with certainty the particular land alleged to be forfeited.

Appeal from Circuit Court, Boone County.

Suit by the State against Ellen Workman and others. From decree for plaintiff, the Pocahontas Coal & Coke Company appeals.

*Reversed and remanded.*

77 W. Va.

*A. W. Reynolds, Joseph S. Clark* and *Goodykoontz & Scheer*, for appellant.

*Leftwich, Byrnside & Shaffer,* for the State.

MASON, JUDGE:

In September, 1899, a bill in chancery was filed in the circuit court of Boone County by the State of West Virginia against William Thompson and others, alleging that certain tracts of land therein described, situated in said county, were forfeited to the State for non-payment of taxes due .thereon, and were liable to be sold for the benefit of the school fund. Among the parcels of land sought to be sold in that proceeding was a tract of 600 acres forfeited in the name of William Thompson. Julian M. Johnson, who was made a party to the suit by the name of James M. Johnson, claimed title to this tract. The Pocahontas Coal and Coke Company was, upon its petition, made a party to this cause, and answered the bill, also claiming title to the land and denied that it was forfeited. Such proceedings were had in said cause that a decree was entered therein on the 15th day of July, 1908, decreeing that said 600 acre tract was forfeited to the State and liable to be sold for the benefit of the school fund, and that said Julian M. Johnson had the right to redeem the same, and that the Pocahontas Coal and Coke Company had no title to the land. From this decree an appeal was taken by the Pocahontas Coal and Coke Company to this court.

In September, 1901, another suit was commenced in the same court in the name of the State of West Virginia as plaintiff, against Ellen Workman and others as defendants, seeking to sell a tract of land containing 286 acres, as forfeited to the State for non-payment of taxes. Said tract of land is claimed by Ellen Workman, who answered the bill and denied that the same is forfeited. In October, 1903, the Pocahontas Coal and Coke Company was made a party. It filed an answer, claiming title to the 286 acres of land, and denied that the land was forfeited. Such proceedings were had in the cause that by an order entered therein on the 9th day of June, 1914, it was decreed that the Pocahontas Coal and Coke Company had no title, that the said 286 acres of

land is not delinquent or forfeited to the State, and that said Ellen Workman has title to said land superior to that of any other party to the proceeding, and decreed that said 286 acre tract be dismissed from the proceeding, and also dismissed the cause as to the Pocahontas Coal and Coke Company. To this decree an appeal and supersedeas was awarded by this court, June 22, 1915.

Both these causes are now submitted for the determination of this court. Many questions of law and fact arising in these causes are common to both, and by agreement of counsel the two causes were argued together. By stipulations filed in this cause, we are permitted to read and consider much of the evidence filed in the Thompson case as far as applicable in deciding this cause, and by a like stipulation some of the testimony in this cause may be used in evidence in the Thompson case.

The appellant, the Pocahontas Coal and Coke Company, claims title to the lands in controversy by virtue of a grant from the State of Virginia to Edward Dillon, dated April 16, 1796, for 50,096 acres. This tract was sold for non-payment of taxes, and bought by Anthony Lawson and Evermont Ward; and the title thus acquired passed by several conveyances, from the heirs of Dillon, and the grantees of Lawson and Ward, to the appellant, the Pocahontas Coal and Coke Company. There is no controversy in this proceeding as to the title of appellant to said 50,096 acres of the land known as the Dillon grant, except as to the two western lines, and the claims of Mrs. Workman, which will be hereafter noticed.

The two lines in controversy are fully examined and described in the said cause of State *v.* Thompson and others, hereinbefore referred to as submitted to this court with this cause and considered with it. The true western boundary of said survey is fixed and established in said cause, and reference is made to the same as part of this opinion, and the finding of the court in said cause as to said boundary lines is adopted as the finding of the court in this cause.

In addition to the carefully prepared and exhaustive opinion of the court in that cause, prepared by Judge MILLER, we may add that the correctness of the conclusions reached by him

in regard to said boundary lines may be strengthened and confirmed by the report of the same made by C. A. Wagner, and his depositions taken after the Thompson case was decided in the circuit court, which are not parts of the record in the Thompson case. It is conceded that the corners at the letters "C" and "E" on the map of the Dillon survey are the true corners of that survey. A corner between these two points is the one in dispute. The corner marked "D" on the map is about 1080 poles from the corner at "E" and about 1434 poles from the corner at "C". These two lines are the exterior lines, and "D" the corner in dispute. The "Sarver survey" locates the corner at two dogwoods, instead of at "D". Judge MILLER, after a careful and complete examination of all the facts, finds the corner to be at "D", instead of at the dogwoods. This conclusion is confirmed by the deposition of C. A. Wagner, not in the Thompson case. A copy of the deed from Charles Reeder and wife to Edward W. Clark, dated October 15, 1895, was shown to witness Wagner. He said he knew the location of the Dillon survey in a general way, and had surveyed some of the lines; that he had surveyed the lines from "C" to "D", and from "C" to the "Sarver dogwoods", and also the lines from "E" to "D", and from "E" to the "Sarver dogwoods". He says there was a very plainly marked line all the way through from the point "E" to "D", where the virgin forest timber had not been cleared or destroyed; that the line as located by him "crossed the ridge and course called for and described in the deed and in addition crossed Buffalo Creek, and approximately a quarter of a mile below what was pointed to me as the location of the Samuel Daniels house." He then ran the line from "D", along the line described in the Reeder-Clark deed and the patent, 5° and 30' variation from the call in the Reeder-Clark deed and the call in the Dillon patent, and terminated "at a precipice or rock at the mouth of Falling Rock Branch on Hazy Creek", the point "C" on the map. When asked in what respect the line run by him corresponds with the calls in the description of that line on the Reeder-Clark deed, he replied: "I wish to state that the correct course of the line was found to be North 66 degrees and 25 minutes East 1434.69 poles. In the main this line

as I ran it, would conform to the description in the deed. However, there is some discrepancy. At two miles on this line called on top of the mountain between Rock Lick and Burnt Camp Branches; the line as I ran it was considerably north of the top of this ridge. However I crossed the same streams that was described and called for in the deed, but I didn't go along to the top of this ridge or even near the top of the ridge between the two branches described." This line took him from "D" to corner "C". He says he ran the line from the corner "E" to the point marked "Sarver dogwood". He says the line "E" to the "Sarver dogwood" is N. 21° and 52' E, which is a departure from the original line of 9° and 52', and the distance 999.24. The original line calls for 1080 poles. He says he did not find any marked timber from "E" to the "Sarver dogwood", and that he made a very careful search for marked timber on both sides of the line for some distance, possibly 200, 300, or possibly 400 feet in some places. When asked whether the ground traversed by the line from the corner "E" to the "Sarver dogwood" corresponds with the ground described in the call of the Reeder-Clark deed, he said: "It does not correspond in that—in that it crosses the ridges described and called for in the deed; it is very defective in that it crosses Buffalo Creek approximately 300 feet below what was pointed out to me as the location of the Samuel Daniels house; the deed described it as being about a quarter of a mile." This witness was then asked about the line from the "Sarver dogwood" to the corner at Falling Rock Branch, known as corner "C". He ran a part of this line, and says he made a very careful examination for marked timber, and found none. He says: "The description given in the deed of the first two or more miles of this line is very defective, in that it describes a line that would not run to the point "C" on Hazy Creek, but would run considerably to the south of it; in other words it is described as crossing the ridge between Pond Fork and Rock Lick at or near a point on top of this mountain; when we were there, and it was probably 600 to 800 feet to the south of where we topped the mountain; and it is also defective in that it describes the line as running along near the top of the mountain or passing a poplar near the

head of Burnt House Branch and Rock Lick, whereas the true line from the "Sarver dogwood" to the mouth of Falling Rock Branch would not run anywhere near the top of that ridge, but would run across the Rock Lick Creek away down some distance from its head." The following questions were then asked this witness, and answers given: Question. "If I understand you correctly, then, the ground traversed by the line from the point indicated as the "Sarver dogwood" to the corner at the mouth of Falling Rock Branch, does not correspond with the call in the deed?" Ans. "No, sir; it does not." Question. "What do you mean by 'defective' in your previous answer?" Ans. "I mean it is erroneous, absurd and contradictory. In other words, you could not run from a point marked "Sarver dogwood" to the point at the mouth of Falling Rock Branch and traverse the locality described in the deed. You never could get there at all. That is on a straight line, and you would run out at some point very much to the south of the corner at the point "C"." Question. "Now I wish to ask you where the lines described in the deed from Reeder to Clark, to which your attention has been called,—being first the line from two linns sugar tree and dogwood and the walnut at the head of one fork of Cole's Branch, North 12 East 1080 poles, the second line running thence North 62 East to the mouth of Falling Rock Branch of Hazy Creek, are located, according to the description of the lines set forth in the deed from Reeder to Clark?" Ans. "They would be located from the point "E" approximately to the point "D" and thence to the point "C", and this location made, of course, on the assumption that the "Sarver dogwood" was eliminated from the proposition; that is the course and distance of the first line from the point "E", instead of going to the point marked "Sarver dogwood", would go approximately two degrees—would go approximately to the point "D" or near it; thence on the next line there would be a departure of approximately two degrees 30 minutes to the left for magnetic variation of the needle to reach point "C"." He says also that in order to reach the corner at the mouth of Falling Rock Branch on Hazy Creek (corner "C"), the descriptive matter contained in the Reeder-Clark deed with reference to the location of

the line either from ''D'' or from the ''Sarver dogwood'' will have to be departed from. It is made plain by this deposition that a straight line from ''E'' crossing Buffalo Creek one-fourth of a mile below Samuel Daniels' house, where the Reeder-Clark deed says the line crosses that creek, will not reach the ''Sarver dogwood''. In order to do this the line must run near this house—about 300 feet below it. The line from the ''Sarver dogwood'' to ''C'' is manifestly wrong. All the evidence points to ''D'' as the corner, as ascertained by Judge MILLER in the Thompson case.

Then looking to the exterior lines of the Dillon survey, as thus located and established, we may proceed to enquire whether or not the circuit court erred in holding that the appellant has no interest in or title to the 286 acre tract.

The records do not make the location of the 286 acre tract quite clear. Mrs. Workman has no deed or conveyance of any kind for a tract of 286 acres. She has a deed for 1500 acres of land, and it is claimed that this 286 tract is included in and is a part of the 1500 acre tract, but her deed states that Daniel Gunnoe and John Gunnoe, Jr. each has deeds for lands embraced in this boundary of 1500 acres. What part of the 1500 acres belongs to her, or either of the others, does not appear. So that it cannot be ascertained from that deed what or how much land she owns. In addition to this, the location of the 1500 acres is not proved with any certainty. Mrs. Workman was assessed for several years with four tracts of land, namely, a tract of 25 acres, a tract of 200 acres, a tract of 75 acres, and another of 100 acres, but not with the 1500 acres; nor was she ever assessed with a tract of 286 acres.

She was examined as a witness in her own behalf. She was asked how many tracts of land she owned on Pond Fork of Little Coal Run in Crook District, and how many acres. This is about where the land is supposed to be located. She answered that she did not know how many acres she had until she ''had it run out, and it was eleven hundred and sixty-one acres.'' Again, in her cross-examination, she said: ''Question. Please state which of the tracts charged to you on the land books as 25 acres, 200 acres, 75 acres and 100 acres represents the 286 acres in controversy in this suit, or

embraces the 286 acres in controversy? Answer. I am not able to say nor never was told. The land had never been surveyed,it was just guess work when if was put on the land books, as to the amount of acres.  Q.  Which one of the tracts if either of them was charged on the land books and the number of acres guessed at as the 286 acres in controversy? Ans.  I would say the 200 acres if either one, for it was always considered a large portion of the land lying up there; was the way he (referring to her husband) always contended. Q.  Then you do not know do you if any of these charges was intended for the land in controversy?  Ans.  Not only just what he told me.  He always told me that was part of the land he was paying taxes on.  Q.  Do you know where the line between the Great Lot No. 22 and 23 of the Rutter and Etting survey crosses the Rock Lick?  Ans.  I do not.''

M. A. Miller, in his deposition and a map filed with it, attempts to locate the Ellen Workman tract of 286 acres as claimed by her within the Dillon survey.  This is the only effort to locate this tract, and it would be too uncertain to base a decree upon.  But wherever her land may lie, she claims under the Rutter and Etting survey.  The part of the land claimed by her as located by Miller, depends upon the location of the western boundary of the Dillon survey. We have located that line as hereinbefore stated.  Mrs. Workman is not entitled to any of the land within the Dillon survey by reason of any title to any land which is part of the Rutter and Etting survey.  It does not appear that she acquired title to any of said land by any other title.  The decree of the circuit court complained of, following the Miller survey, would give her title to that part of the 286 acres located within the Dillon survey as well as title to the lands outside of that survey.  This is erroneous and prejudicial to appellant, and for that reason the decree will have to be reversed.

The decree here will be that the decree of the circuit court be reversed, and that all the land within the boundary of the 286 acres which lies south of the line ''C'' ''D'' and within the Dillon survey, as surveyed by M. A. Miller, and as laid down on the maps or plats ''M. A. M. No. 5'' and the map ''No. 1'' filed with the deposition of J. E. Wagner, be dismissed out of this suit, and that the Pocahontas Coal and

Coke Company has title thereto; and no one denying that Ellen Workman has title to all of said 286 acres lying outside of the Dillon survey, as located by the Miller survey, the decree will be affirmed as to that; but as to that portion of the land lying outside of the boundaries of the Dillon survey, and the land covered by said deeds of 1901 and 1902, and outside of the said line 'C'' ''D'' laid down on the said plats, which belongs to said Ellen Workman and is unascertained, the cause will be remanded to the circuit court of Boone County with direction to ascertain the location and quantity of land to which said Ellen Workman holds title.

*Reversed and remanded.*